UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) | **CRIMINAL ACTION** |
| v. | ) ) ) ) | **NO. 19-40049-13-TSH** |
| **PEDRO VILLOT-SANTIAGO** | ) ) ) |  |
| **Defendant** | ) ) |  |

**MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT'S MOTION TO SUPPRESS**
August 3, 2022

**HILLMAN, D.J.**

The United States of America (the "Government") charged Pedro Villot-Santiago (hereinafter, the "Defendant") with controlled substance offenses. Defendant moved to suppress all evidence that was seized on July 23, 2020, as a result of his arrest and a search of 177 Lincoln Street, Fitchburg, Massachusetts. On March 29 and April 27, 2022, this Court held evidentiary hearings, during which FBI Task Force Officer John Anthony Bartolomucci (hereinafter, "TFO Bartolomucci") and FBI Special Agent Michael Little ("SA Little") testified. At the end of the April 27, 2022 hearing, the Defendant requested that the Court permit additional briefing, which the Court allowed. On June 10, 2022, the Defendant filed a post-hearing memorandum and the Government filed a reply. For the following reasons, the Court ***denies*** the motion to suppress.

## BACKGROUND[1]

On July 22, 2020, a federal grand jury sitting in Boston, returned a Superseding Indictment, charging Pedro Villot-Santiago (hereinafter, the "Defendant"), and seventeen others, with controlled substance offenses. The Superseding Indictment was the result of a two-year investigation into a drug trafficking organization ("DTO") operating in the Fitchburg area of Massachusetts. The investigation began following a fatal overdose on September 7, 2018, after which the victim's autopsy report indicated that he died from acute fentanyl and heroin intoxication. Text messages on the victim's phone led agents to identify an individual who the victim contacted to purchase drugs just before his fatal overdose. This individual agreed to cooperate with law enforcement and advised that the heroin that caused the victim's death was sold to the individual by Pedro Baez.

Beginning in July 2019, United States District Court Judges for the District of Massachusetts issued orders pursuant to Title III authorizing the interception of wire and electronic communications to and from the telephones used by members of the DTO and its suppliers, including two telephones used by the Defendant. Through the Title III interceptions, related physical surveillance, and controlled purchases, agents were able to identify the Defendant as a large-scale powder and crack cocaine supplier, who supplied both substances to the DTO. Over the course of the investigation, agents seized over 1.8 kilograms of a mixture of heroin and fentanyl, over 3.6 kilograms of cocaine, and over 50 grams of crack cocaine. Based on interceptions, surveillance, and seizures, investigators believe that between October 2019 and February 2020, the Defendant distributed approximately 535 grams of crack cocaine and approximately 2.6 kilograms of powder cocaine.

---

[1] The following are facts that the Court finds based on the materials submitted in support of this motion, the audio recording of the Defendant's interview and the evidentiary hearings.

In connection with the Superseding Indictment, on July 23, 2020, investigators arrested the Defendant at 177 Lincoln Street, Fitchburg, Massachusetts — the residence of the Defendant's girlfriend Bryanna Morey (hereinafter, "177 Lincoln Street"). On July 23, 2020, at approximately 6:00 a.m., law enforcement officers arrived at 177 Lincoln Street, to execute the arrest warrant. Upon arrival, investigators observed two vehicles parked in the driveway and in the front of 177 Lincoln Street. The house, at one time likely a single family home, is now a duplex with the left side of the house numbered 179 Lincoln Street with a door off to the side and the right side of the house numbered 177 Lincoln Street at the front door.

TFO Bartolomucci knocked on the front door at 177 Lincoln Street and announced the presence of police, while other officers took positions around the side and back of the house. SA Little, stationed at the back right corner of the house, heard movement inside the residence and observed an individual looking out the bedroom window. No one answered the door and after waiting approximately 2-3 minutes, the officers forced entry. Once the door was open, standing outside on the porch, TFO Bartolomucci announced the police presence several times. The Defendant walked into the end of the hallway from the right side, approached the front door, and investigators placed him under arrest.

Immediately thereafter, Ms. Morey entered the hallway and also walked to the front door. TFO Bartolomucci explained to Ms. Morey that investigators had a federal arrest warrant for the Defendant. Ms. Morey told investigators that she was the sole resident of 177 Lincoln Street, and that the Defendant was her boyfriend. TFO Bartolomucci asked Ms. Morey for permission to be present in her residence and to conduct protective sweep to ensure that no one else was present. Ms. Morey stated that the officers could be present and could search her residence:

> Q: [W]hen you explained you wanted to do a protective sweep, what was her response?

> A: You're free to do that, it's okay.
>
> Q: Did she say anything about whether or not anyone else was present in the apartment?
>
> A: She indicated that they were the only two there, but – and I understood what she said. I – but I, again, I said I had to be sure of that.
>
> Q: And what did she say in response to that?
>
> A: She said that was fine.

*March Transcript* (Docket No. 636)., p. 18, lines 6-15.

While investigators performed the protective sweep of the apartment, TFO Bartolomucci and Ms. Morey went down the hallway and sat in the dining room. They were joined by SA Little. During this time, another officer informed TFO Bartolomucci that during the sweep, a bag with a large amount of currency was seen in the bedroom. TFO Bartolomucci advised Ms. Morey of her rights with a written Advice of Rights form which provided her with *Miranda* warnings. Ms. Morey stated that she understood her rights, and she then signed a form acknowledging this. TFO Bartolomucci explained to Ms. Morey that investigators wanted to search her residence, and Ms. Morey signed a consent to search form authorizing the search of her residence. TFO Bartolomucci told Ms. Morey that she could refuse the search at any time. Ms. Morey told investigators that she was the lessee for the apartment, that the Defendant, her boyfriend of two years routinely slept at 177 Lincoln Street, and that he resided at 23 Congress Street, Apt. 2, in Fitchburg. Ms. Morey further told investigators that the Defendant had a few personal items at 177 Lincoln Street, but that most of his property, including his clothing, were at his apartment at 23 Congress Street.

After Ms. Morey signed the consent to search form, investigators searched 177 Lincoln Street. In the bedroom that the Defendant and Ms. Morey came out of when investigators entered the apartment, investigators observed three bags on the floor near the bed, including the paper

bag of currency noticed during the protective sweep and two other bags which were drawstring gym-style bags. A large amount of U.S. currency was visible in the open-top paper bag and the open drawstring bag. The third bag, which was identical to the open drawstring bag was discovered in proximity to the other bags and had a similar appearance. In total, the bags contained $252,600. The officers also found large amounts of U.S. currency in other areas of the bedroom. Ms. Morey told the officers that the contents of the three bags were not hers, and that although she had seen the bags in the room when she came home late the night before, she did not know what was in them. The additional money found in the bedroom belonged to Ms. Morey, who told investigators it was money she obtained from tending bar at a local restaurant in Fitchburg. Based on those statements, investigators did not seize the additional cash located in the bedroom but did seize the three bags containing a total of $252,600.

During the search of the bedroom, officers also found a loaded Smith and Wesson .38 revolver with a laser sight attachment. The firearm was found under the mattress on the right side of the bed. Ms. Morey told investigators that she had never seen the firearm. In addition to the handgun and the $252,600 in cash that investigators seized, investigators observed a digital scale, two boxes of sandwich bags, as well as what appeared to be a ledger with dollar amounts and dates written on it. Investigators took photos of these objects but did not seize them.

## Discussion

Warrantless searches are per se unreasonable under the Fourth Amendment unless the government can show that the search falls within one of the carefully defined sets of exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971); *United States v. Coraine*, 198 F.3d 306, 309 (1st Cir.1999). One of the established exceptions to the warrant requirement is a search that is conducted pursuant to an individual's valid consent. *United States v. Matlock*, 415 U.S. 164, 165–66 (1974); *Coraine*, 198 F.3d a 309 (1st Cir.1999); *United States v. Twomey*, 884 F.2d

46, 50 (1ˢᵗ Cir.1989). Because the favored practice is a search pursuant to a warrant, and waivers are disfavored, the government has the burden of proving a valid, voluntary consent by a preponderance of the evidence. *See United States v. Winston*, 444 F.3d 115, 121 (1ˢᵗ Cir.2006).

The Government contends that Ms. Morey gave her voluntary consent for the officers to conduct a protective sweep and then search of the apartment based on the testimonies of TFO Bartolomucci and SA Little and the signed consent form. The Defendant argues that Ms.Morey did not voluntarily consent to the search of her apartment.

An exception to the search-warrant requirement is a search by consent." *United States v. Winston*, 444 F.3d 115, 121 (1ˢᵗ Cir.2006), citing *United States v. Forbes,* 181 F.3d 1, 5 (1st Cir.1999) . "In order to establish this exception, 'the government must prove valid consent by a preponderance of the evidence.'" *Id*. (citation omitted). "Consent to a search may be express or inferred." *United States v. Reynolds*, 646 F.3d 63, 72 (1ˢᵗ Cir.2011); *Winston*, 444 F.3d at 122. "To be valid, a consent to search must of course be voluntary." *Winston*, 444 F.3d at 121. "The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search." Id. (*quoting United States v. Miller*, 589 F.2d 1117, 1130 (1ˢᵗ Cir.1978)).

The voluntariness of that consent "is a question of fact that turns on an evaluation of multiple factors, including the consenting party's age, education, experience, intelligence, and knowledge of the right to withhold consent." *Reynolds*, 646 F.3d at 72–73. "Further considerations include ... whether the consent was obtained by coercive means." *Id*. "Although sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, 'custody alone has never been enough in itself to demonstrate ... coerced ... consent to search.' " *United States v. Barnett*, 989 F.2d 546, 555 (1ˢᵗ Cir.1993) (internal citation omitted) (*quoting United States v. Watson*, 423 U.S. 411, 424 (1976)).

6

"Moreover, it is not essential that the officers inform the consenting party of the right to withhold consent, though knowledge of the right to withhold consent is a factor to be considered in assessing voluntariness." *Id*. (*citing Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Finally, "valid consent requires more than mere acquiescence in the face of an unfounded claim of present lawful authority." *United States v. Brake*, 666 F.3d 800, 806 (1st Cir.2011) (internal quotation marks omitted) (*citing Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

Here, Ms. Morey gave both verbal and written consent. TFO Bartolomucci testified multiple times, both on direct and cross-examination, that when Ms. Morey was asked if investigators could do a protective sweep, she replied yes. TFO Bartolomucci testified that after Ms. Morey consented to the protective sweep, he advised Ms. Morey of her *Miranda* rights by providing her with a written Advice of Rights Form; reading the form to her line by line, and giving her time to read through it herself. After being advised of her rights, and given the opportunity to read the form, Ms. Morey signed the Advice of Rights Form, as witnessed by TFO Bartolomucci and SA Little. SA Little corroborated TFO Bartolomucci's testimony, testifying that TFO Bartolomucci provided Ms. Morey with the Advice of Rights Form, read it to her line by line, and gave her time to read through it herself. SA Little testified that when he got to the dining room that Ms. Morey's eyes were red, and that he concluded she had been upset at some point, but that she was calm and attentive by the time he got there and that she was engaged in "small talk."

TFO Bartolomucci testified that he went through the same process with the Consent to Search Form, reading through it line by line, and allowing Ms. Morey time to review the form. TFO Bartolomucci testified that after going through the document with her and confirming that she was the sole resident of the property, that Ms. Morey signed the Consent to Search Form. TFO Bartolomucci also testified that Ms. Morey's demeanor was calm, and at no point did she

seem confused about what was going on or what she was asked to sign. TFO Bartolomucci testified that she was never threated with prosecution, that she was advised of her right to refuse consent, that she was in her own home, and that officers did not have weapons drawn while they were talking. SA Little corroborated TFO Bartolomucci's testimony with respect to Ms. Morey signing the Consent to Search Form.

At the time the written consent was given, the Defendant had been removed from the home and some of the activity from the entry and arrest had subsided. There is no evidence on the record that the officers used any overt tactics to pressure Ms. Morey's consent or that she was upset when speaking with TLO Barolomucci. She was not interrogated or threatened. Until written consent was given, the officers had conducted only the protective sweep to which Ms. Morey had consented. Considering the totality of the circumstances, the Court finds that Ms. Morey's consent to search the apartment was voluntary.

In a sworn affidavit, Ms. Morey claims that the officers did not ask for her permission for a protective sweep of the apartment or to search the apartment. *See* Docket No. 407-2, at 2-3. Ms. Morey also avers that she was emotionally distraught during the process and was not permitted to read the forms. *Id*. The Court gives little weight to this affidavit in the absence of live testimony in open court. *See United States v. Phillipos*, 849 F.3d 464, 469 (1st Cir. 2017) (explaining that, pursuant to *United States v. Baskin*, 424 F.3d 1 (1st Cir. 2005), a district court need not credit a defendant's affidavit in ruling on a motion to suppress where the defendant refuses to submit to cross-examination), cert. denied, 138 S. Ct. 683 (2018). The Court therefore credits the testimony of TFO Bartolomucci and SA Little that corroborates Ms. Morey's

demeanor and consent for the searches. *Accord U.S. v. Pimentel*, 2019 WL 3767514, at *4 (D. Mass. Aug. 9, 2019) (Saris, J.), *aff'd*, 26 F.4th 86 (1st Cir. 2022).[2]

In his post-hearing memorandum, Defendant contends that Ms. Morey's consent was tainted by knowledge of the money found during the search, relying on *United States v. Delgado-Perez*, 867 F.3d 244, 256 (1st Cir. 2017) and *United States v. Serrano-Acevedo*, 892 F.3d 454, 459 (1st Cir. 2018). Those cases, and others cited by the Defendant, presume that the sweep or search in question was illegal. Because the Court found that Ms. Morey's consent was voluntary and not coerced, the protective sweep and subsequent search were therefore legal and not subject to the test of "determining whether the prior illegality 'significantly influenced' or 'played a significant role' in the subsequent consent." *United States v. Cordero-Rosario*, 786 F.3d 64, 76 (1st Cir. 2015).

## Conclusion

For the reasons stated, Defendant's motion to suppress evidence is **denied**. (Docket No. 407).

**SO ORDERED.**

/s/ Timothy S. Hillman
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

---

[2] The Defendant argues that he has standing to challenge the legality of the search even though his name is not on the lease to the apartment. While the Court agrees that he has standing, see *Minnesota v. Olson*, 495 U.S. 91 (1990), he did not have the authority to override Ms. Morey's lawful consent, *see Georgia v. Randolph*, 547 U.S. 103, 122-123 (2006), as Defendant was outside in the police vehicle and was not physically present to object to the search.